IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAVID L. BOYSEN,

    Plaintiff,

      v.

ILLINOIS TOOL WORKS INC.
SEPARATION PAY PLAN, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:15-CV-1900-TWT

## OPINION AND ORDER

This is an ERISA action.  It is before the Court on the Defendants Illinois Tool Works Inc. Separation Pay Plan (the "Plan") and Illinois Tool Works Inc.'s ("ITW") Motion for Summary Judgment [Doc. 38]. For the reasons set forth below, the Defendants' Motion for Summary Judgment [Doc. 38] is GRANTED.

### I. Background

ITW is a Delaware corporation with its principal place of business in Illinois.[1] ITW sponsors a self-funded ERISA welfare benefit plan entitled the ITW Separation Pay Plan.[2]  ITW designates one of its own employees as Plan Administrator of the

---

[1]      Compl. ¶ 3.

[2]      Defs.' Statement of Material Facts ¶ 1.

Plan. The Plan provides for a multi-level claims process, where an eligible employee who does not believe that the Plan was applied correctly to his situation may file a claim for benefits in writing with the Plan Administrator.[3] Among other benefits, the Plan offers severance pay for employees who are laid off. In order to qualify for severance, employees must be let go "due to a permanent job elimination," and must "continue[] to work satisfactorily until his or her termination date, as designated by the Company."[4] However, employees who are fired for "cause" are not eligible for severance pay, regardless of whether they would have otherwise qualified.[5] The Plan defines "cause" as including, but not limited to, "unsatisfactory job performance."[6]

The Plaintiff David Boysen began working for ITW as a Controller in 2001.[7] He was an at-will employee. In 2006, the Plaintiff became the General Manager for ITW's Techspray business unit in Amarillo, Texas.[8] In 2010, ITW began to

---

[3]      Id. at ¶ 8.

[4]      Id. at ¶ 9. There are other eligibility requirements, but they are not an issue in this case.

[5]      Id. at ¶ 10.

[6]      Id. at ¶ 11.

[7]      Id. at ¶ 12.

[8]      Id. at ¶ 13.

consolidate many of its disparate business platforms into larger divisions.[9] Among these consolidations, Techspray was merged with ITW's other businesses Prolex and Chemtronics.[10] The resulting business unit was then known as ITW Contamination Control Electronics Group ("ITWCC").[11]

Prior to this merger, Techspray and Chemtronics each had its own manager, but these roles were combined into one manager position to oversee the new consolidated entity.[12] After the merger, Boysen was promoted to this new management position effective May 1, 2012, in which he reported directly to the Vice President and General Manager of ITW Contamination Control Worldwide, Monte Hammouri.[13] He continued in this position until he was fired by ITW on March 17, 2014.[14]

The parties agree on all of the facts stated so far, but they fundamentally disagree about why Boysen was let go. ITW claims that he was let go because of poor performance. As early as the beginning of 2013, ITW claims that it had concerns

---

[9]     Id. at ¶ 15.

[10]    Id.

[11]    Id.

[12]    Id. at ¶ 16.

[13]    Id. at ¶¶ 16-17.

[14]    Id. at ¶ 39.

about the financial performance of the Techspray component of ITWCC.[15] On August 1, 2013, Hammouri emailed Boysen about his concerns with ITWCC's financial performance, to which Boysen responded, "We are also very disappointed in our outlooking and financial performance and working hard to eliminate 'surprises.'"[16] On December 3, 2013, Boysen received an unsatisfactory review and assessment based on various performance metrics.[17] One week later, Boysen received another review which said that he "need[ed] improvement" in his overall performance.[18]

After these two reviews, Boysen was placed on a Performance Review and Improvement Plan ("PIP").[19] The PIP included six enumerated objectives, and notified Boysen:

> that in order for you to continue in your current role, you must show immediate and sustained improvement in your performance...However, if you are unable to bring your performance to an acceptable level in 90 days and to consistently maintain that level of performance, it may be necessary to take additional action including, and up to termination of your employment with ITW.[20]

---

[15]   Id. at ¶ 21.

[16]   Id. at ¶¶ 22-23.

[17]   Id. at ¶ 26.

[18]   Id. at ¶ 28.

[19]   Id. at ¶ 29.

[20]   Id. at ¶¶ 29-30.

Further, as part of the PIP process, the Plaintiff agreed to have bi-monthly reviews of his progress.[21]

According to ITW, the results of the PIP period were not successful. During the January period, Boysen missed revenue projections by $602,000, and missed operating income projections by $382,000.[22] The Plaintiff admitted during the February PIP period that the financial performance of ITWCC was "not meeting expectations."[23] And during the March PIP period, Boysen agreed that results were "[v]ery disappointing."[24] During a performance review meeting on March 10, 2014, Boysen was allegedly told that "his performance was unsatisfactory to date."[25] One week later, the Plaintiff was fired.

Boysen does not dispute any of these hard facts, but he tells a different story about them. According to Boysen, the performance goals that were set were unreasonable, pretextual, and largely part of a retaliatory effort to get rid of him as a

---

[21]   Id. at ¶ 32.

[22]   Id. at ¶ 33.

[23]   Id. at ¶ 34.

[24]   Id. at ¶ 36.

[25]   Id. at ¶ 38.

result of the souring relationship between him and Hammouri.[26] Prior to his disagreements with Hammouri, Boysen alleges that all of his reviews were positive, and that Hammouri had even described Boysen as the "highest of high potential."[27] However, beginning in June and July of 2013, it seems Hammouri and Boysen began to have more frequent disagreements, eventually leading to what Boysen says was his first negative performance review ever in December 2013.[28] Boysen contends that Hammouri doomed him to fail by front-loading all of 2014's growth expectations into the first quarter of the year, essentially setting performance benchmarks which were impossible for Boysen to meet.[29] And despite significant market challenges, Boysen says that he continued to outperform the overall electronics division of ITW.

Boysen also argues that his job was eliminated. When ITW decided to consolidate many of its disparate businesses into larger, more streamlined business units, Boysen says that it did the same with the management positions of those units. After the restructuring, the position of General Manager was eliminated for most businesses of ITWCC's size and was replaced by the role of a Business Unit

---

[26]     Pl.'s Statement of Additional Material Facts ¶ 28.

[27]     Id. at ¶ 27.

[28]     Id. at ¶¶ 29-30.

[29]     Id. at ¶ 32.

Manager.[30] However, in the case of Boysen and ITWCC, ITW decided to allow Boysen to continue using the title General Manager and grow ITWCC until it reached a size that justified being led by a General Manager.[31] In other words, though Boysen's title stayed the same, he is essentially arguing that he was promoted.

After he was let go, however, Boysen argues that his job at ITWCC was eliminated and he was replaced with a lower level Business Manager.[32] To be sure, the job description, advertisement for, and offer letter to Boysen's replacement that ITW eventually produced did describe the position as a "Business Unit Manager."[33] And the advertisement and offer letter only described the job as Business Unit Manager of Chemtronics alone, though the job description did state that it covered the ITWCC Electronics Group.[34] But ITW alleges that the duties of Boysen's replacement were the same as Boysen. And the company argues that the substance of the job was the same, even if the titles changed.

---

[30]     Id. at ¶ 9.

[31]     Id. at ¶ 11.

[32]     Id. at ¶ 47.

[33]     Administrative Record, at 145-49 (hereinafter "AR").

[34]     Id. The Administrator also acknowledged that it only described Chemtronics, but that it was his understanding that Boysen's replacement had also taken over control of Techspray and Prolex.

After Boysen was fired, he made a claim for severance benefits under the Plan.[35] On June 27, 2014, the Plan Administrator denied Boysen's claim.[36] In a letter to the Plaintiff describing his decision, the Administrator stated that, "the basic fact is that you were terminated for reasons other than the elimination of your job."[37] The Administrator did note that, "there may, or may not, be other reasons that would preclude receipt of benefits under the Plan but review of such is unnecessary given the lack of job elimination as the precipitating cause for your separation."[38]

Boysen appealed that initial determination, and requested a number of documents related to whether the General Manager position had been eliminated, including:

- Documentation supporting ITW's assertion that the title of "General Manager" was changed across all ITW businesses to "Business Unit Manager";
- The identity of all current General Managers at ITW;
- Job descriptions for General Manager I and Business Unit Manager;
- Updated 2014 financial information for Mr. Boysen's business unit and ITW's electronics division; and

---

[35]   Defs.' Statement of Material Facts ¶¶ 47-50.

[36]   Id. at ¶ 51.

[37]   AR, at 84.

[38]   Id.

- The offer letter provided to Mr. Boysen's replacement, and basic payroll information for both positions...showing grade level, classification, responsibilities, eligibility for stock, and compensation range....[39]

Before deciding the appeal, the Administrator responded to Boysen by clarifying the grounds of the earlier denial, writing, "**[t]hat Mr. Boysen was found to have not lost his job due to a 'job elimination' was and is the sole basis for the prior denial of benefits.**"[40]

In that response, the Administrator also denied Boysen's document requests as irrelevant to the issue of whether there had been a job elimination.[41] In particular, the Administrator said that there was "no singular or unified job description for all General Manager Is or Business Unit Managers," and, "[r]egarding Mr. Boysen's position, there is no written description reflecting his last role."[42] The Administrator attached the offer letter, advertisement, and job description of Boysen's replacement discussed above, but redacted the financial information related to that position, stating that "it has no bearing on whether Mr. Boysen's job was eliminated."[43]

---

[39] Id. at 110.

[40] Id. at 115 (emphasis in original).

[41] Id. at 115-16.

[42] Id. at 116.

[43] Id.

Eventually, the Administrator denied Boysen's appeal on December 3, 2014. Again, the Administrator found that "Mr. Boysen's job was not permanently eliminated but rather he was replaced...and that the change in title of the position does not equate to a permanent job elimination under the Plan."[44] The Administrator also noted that it had offered the opportunity for Boysen to submit evidence in support of his appeal after the Administrator had denied his requests for documents.[45] According to the Administrator, no other evidence was submitted.[46]

Boysen filed this action on March 27, 2015, claiming that he did not receive a full and fair review of his claim because he was not provided access to the documents he had requested, and that even if he had, the Administrator's decision was wrong. The Defendants counter that the Administrator's decision was correct because he was fired for cause and he provided no evidence that his job had been eliminated. The Defendants now move for summary judgment.

## II. Legal Standard

ERISA denial of benefit claims have a different standard of review than a normal motion for summary judgment. Though the statute and the regulations do not

---

[44]  Id. at 152.

[45]  Id.

[46]  Id.

prescribe a particular standard, the Eleventh Circuit has outlined a six part test to guide courts in their analysis, known as the <u>Williams</u> test.[47] The steps are:

(1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.[48]

---

[47] <u>See</u> <u>Blankenship v. Metro. Life Ins. Co.</u>, 644 F.3d 1350, 1354 (11th Cir.2011) (modifying the original test laid out in <u>Williams v. BellSouth Telecommunications, Inc.</u>, 373 F.3d 1132 (11th Cir. 2004)).

[48] <u>Id.</u>

Though this is the normal framework, ERISA also requires Plans to give participants an opportunity for a "full and fair review" of their claim if it has been denied.[49] The Eleventh Circuit has viewed this requirement as a "predicate to [a court's] ability to review the substantive decision [it has] been asked to review."[50]

### III. Discussion

The Plaintiff challenges the benefit denial on two grounds: (1) he did not receive a full and fair review, and (2) the denial was wrong on the merits. A full and fair review is a "predicate" to this Court's ability to substantively review the Plan Administrator's decision.[51] As a fiduciary, a plan administrator is required to act as a reasonable and prudent person in his position would.[52] This means that an administrator must adequately investigate any reasonable arguments put forward by a claimant in the appeal process.

### A. Scope of a Full and Fair Review

---

[49]     29 U.S.C. § 1133.

[50]     Melech v. Life Ins. Co. of N. Am., 739 F.3d 663, 673 (11th Cir. 2014).

[51]     Id.

[52]     Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1199 (11th Cir. 2010) (citing 29 U.S.C. § 1104(a)(1)).

The Eleventh Circuit has articulated a standard of reasonableness when it comes to a plan administrator's duty to investigate and consider evidence, and under some circumstances it has remanded cases for failure to do so. In <u>Capone v. Aetna Life Ins. Co.</u>, the plaintiff struck his head on the bottom of the ocean while diving in the Bahamas, paralyzing himself from the neck down.[53] When he was taken to the hospital, a blood test revealed that the plaintiff's blood alcohol content was somewhere north of 0.2.[54] When the plaintiff sought disability benefits, the plan denied his claim on two grounds. First, the plan said that it was not an "accident" under the policy because the plaintiff had taken unnecessary and foreseeable risks by "voluntarily diving from a fifteen to twenty foot high dock into the ocean."[55] The plan only considered an accident report from the property owner, as well as testimony provided by a security officer "who indicated that 'no diving' signs were posted on the dock and ignored by [the plaintiff]."[56] The plan also claimed that because the

---

[53]   <u>Id.</u> at 1192.

[54]   <u>Id.</u> at 1192-93.

[55]   <u>Id.</u> at 1193.

[56]   <u>Id.</u>

injuries were "caused or contributed to by the use of alcohol," the plaintiff was not entitled to benefits even if it was an accident.[57]

The plaintiff appealed the original determination. In his appeal, the plaintiff argued that "no diving" signs were not posted, that the dock was only four to five feet above the water, that tidal action could have caused the injury, and that he was not intoxicated at the time of accident.[58] The plaintiff provided the plan with photographs which supported his assertions. Despite this evidence, the plan denied his appeal without investigating or addressing the additional evidence the plaintiff had provided.[59]

The Eleventh Circuit eventually remanded the case due to the plan's failure to investigate the plaintiff's arguments. The plan "failed to investigate...the tidal conditions at the time of the accident...made no attempt to locate other guests who might have been on the scene," and took no action even after the plaintiff had shown that its original understanding of the dock height was "clearly erroneous."[60] The court remanded the case back to the plan administrator because the plan's failure to

[57]   Id.

[58]   Id. at 1193-94.

[59]   Id.

[60]   Id. at 1199.

investigate and address the issues raised in the appeal was "*de novo* wrong."[61] Though the court analyzed the issue under the first step of the Williams test, it also articulated the standard for an administrator's duty to investigate. The court cited the ERISA standard for fiduciaries, which states that a fiduciary shall "discharge his duties...with the care, skill, prudence, and diligence under the circumstances...that a prudent man acting in a like capacity and familiar with such matters would use...."[62] In other words, the court said that the plan "had the responsibility to fully investigate [the plaintiff's] claims before denying benefits."[63]

The Defendants urge the Court to look to the regulations promulgated pursuant to ERISA to define what evidence is relevant, as some other courts have done.[64] Under these regulations, an ERISA governed plan is required to provide a full and fair review, and that a claims process will not be deemed to be full and fair "*unless* the claims procedures...(iii) provide that a claimant shall be provided...reasonable access to...all documents, records, and other information relevant to the claimant's claim for

---

[61]    Id. at 1200.

[62]    Id. at 1199 (citing 29 U.S.C. § 1104(a)(1)).

[63]    Id. at 1199-1200.

[64]    See Finch v. Hillshire Brands Co., 83 F. Supp. 3d 1211, 1226-1229 (N.D. Ala. 2015).

benefits."[65] The regulations define "relevant" as anything that was relied upon, submitted, considered, or generated in the course of making the benefit determination.[66] To be sure, this does not mean that an administrator is required to "ferret out evidence" for every conspiracy theory put forward by claimants, let alone evidence which is in the possession of others.[67] But an administrator's refusal to consider evidence or search for it will be judged against the standard of prudence laid out in ERISA.[68]

---

[65]     29 C.F.R. § 2560.503-1(h)(2) (emphasis added). The Court acknowledges that on December 19, 2016, the Employee Benefits Service Administration adopted regulations amending this section that may or may not change this analysis. See Claims Procedure for Plans Providing Disability Benefits, 81 Fed. Reg. 92316 (to be codified at 29 C.F.R. pt. 2560). However, those regulations are not effective until January 18, 2017, and do not apply to claims filed before January 1, 2018. Therefore, the Court does not need to address them here.

[66]     29 C.F.R. § 2560.503-1(m)(8).

[67]     Melech, 739 F.3d at 673.

[68]     See 29 U.S.C. § 1104(a)(1)

**B. Review of Boysen's Claim**

As discussed, Boysen requested a number of different types of documents. The Plan Administrator repeatedly stated that the fact that Boysen "was found to have not lost his job due to a 'job elimination' was and is the sole basis for the prior denial of benefits."[69] Because the issue of job elimination was the only one which the Administrator considered, the Administrator only needed to investigate arguments that were reasonably connected to that issue. Whether Boysen was fired for cause is irrelevant.

This is not a case where the Administrator refused to consider evidence submitted by the Plaintiff. The Administrator made a reasonable response to the Plaintiff's document requests. The Plaintiff has failed to show a reasonable likelihood that production of the additional documents requested would have made any difference in the rejection of his claim initially and on appeal. The mere fact that there is a dispute about what should have been produced is insufficient to justify a remand of the matter for further consideration by the Administrator of information that it has already deemed to be irrelevant to the critical decision of whether the Plaintiff's position was eliminated.

---

[69]     AR, at 115.

**C. Applying the <u>Williams</u> Test**

The Plaintiff's claim fails under the first three steps of the <u>Williams</u> test.  First, the decision of the Administrator to deny the claim was not "wrong." The documentary record is absolutely clear that the Plaintiff was fired for poor performance. There is no evidence that this was a pretext for eliminating his position. Second, the Administrator was given discretion in reviewing claims under the Plan. Third, the Administrator had reasonable grounds to support the initial denial of benefits and the subsequent denial of the appeal. Again, the fact that the Plaintiff did not receive all of the documents that he requested does not mean that the decision of the Administrator was unreasonable.

## IV. Conclusion

For the reasons stated above, the Defendants' Motion for Summary Judgment [Doc. 38] is GRANTED.

SO ORDERED, this 4 day of January, 2017.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge