[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13145
_____

D.C. Docket No. 1:15-cv-01900-TWT

DAVID L. BOYSEN,

Plaintiff-Appellant
Cross Appellee,

versus

ILLINOIS TOOL WORKS INC. SEPARATION PAY PLAN,
ILLINOIS TOOL WORKS, INC.,

Defendants-Appellees
Cross Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(April 3, 2019)

Before TJOFLAT and JORDAN, Circuit Judges, and HUCK,[*] District Judge.

PER CURIAM:

David Boysen appeals an order granting summary judgment to his former employer, Illinois Tool Works, Inc. ("ITW"), and the Illinois Tool Works Inc. Separation Pay Plan ("the Plan"), on his claim for separation pay benefits under the Plan, as well as an order denying his motion for reconsideration. Mr. Boysen argues that the district court erred in granting summary judgment because the plan administrator failed to provide him with a full and fair review, as required by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"), its applicable regulations, and the terms of the Plan. He further argues the plan administrator's decision was not supported by "reasonable grounds." Mr. Boysen also appeals two other rulings: the denial of his motion to compel discovery, and the denial of his emergency motion to extend time to respond to the summary judgment motion under Federal Rule of Civil Procedure 56(d).

ITW and the Plan, for their part, cross-appeal. They seek reversal of the district court's order denying them attorney's fees.

Following a review of the record, and with the benefit of oral argument, we agree with Mr. Boysen that the plan administrator did not engage in a full and fair

---

[*] Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

review of his claim, and vacate the district court's order.  Given that ruling, we do not address the discovery or attorney's fee orders.

## I

Mr. Boysen is a beneficiary of a separation pay benefits plan issued and administered by ITW, his former employer.  Both ITW and the Plan, as noted, are parties to this action.

ITW's administration of the Plan is governed by the terms of ERISA.  ITW has designated one of its employees, Elliot Goldman, as the plan administrator.

## A

Under the terms of the Plan, an employee is eligible to receive severance payments if the circumstances of his termination meet four threshold conditions—among them, that the employee was terminated "due to a permanent job elimination."  Separation Pay Plan ("SPP") ¶ 2.1(a)(ii).  Notwithstanding any position elimination, an employee may be ineligible for severance benefits if he was terminated "for cause."  *Id.* ¶ 2.1(b)(i).  Termination for "unsatisfactory job performance" is considered termination for cause.  *Id.* ¶ 2.2(b).

The Plan sets out the procedures for filing and deciding benefits claims.  An employee may file a claim if he believes the terms of the Plan have been applied incorrectly to his termination.  If the plan administrator denies the claim, the notice of decision must include (1) the specific reasons for the adverse determination; (2)

reference to the specific provisions of the Plan relied upon to reach the decision; (3) a description of additional information necessary to perfect the claim and an explanation of why such information is necessary; and (4) a description of the Plan's review procedures and the applicable time limits. *See id.* ¶ 5.1. These requirements comport with the claims procedure requirements under ERISA. *See* 29 U.S.C. § 1133.

Following an adverse determination, an employee has 60 days to appeal the decision in writing. *See id.* ¶ 5.2. He may submit documents or arguments in support of his position and may also examine the Plan and other documents upon which the determination was based. The plan administrator must issue a decision within 60 to 120 days.

Under both the terms of the Plan and the applicable ERISA regulations, the plan administrator must undertake a "full and fair review" of the claim denial. *See id.* ¶ 5.3; 29 U.S.C. § 1133(2). According to the Plan, this "full and fair review" requires the plan administrator to take into account "all comments, documents, and other information submitted by the claimant . . . relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." *Id.* The notice of final decision must include the specific reasons and provisions upon which the determination is based, and inform the claimant of

his right to receive access to and copies of all documents relevant to his claim and of his right to bring a civil action pursuant to ERISA within six months.  *See id.*

## B

Mr. Boysen began working as an at-will employee for ITW in 2001.  In 2006, he was promoted to General Manager of ITW's Techspray business.  In 2010, ITW began consolidating several of its businesses.  One such consolidation saw ITW's Techspray, Prolex, and Chemtronics businesses brought into a single "business unit" known as the ITW Contamination Control Electronics Group ("ITWCC").  Mr. Boysen was promoted to General Manager of ITWCC on May 1, 2012.

The parties differ in their assessments of Mr. Boysen's performance in that role.  ITW asserts that financial performance under Mr. Boysen's leadership was subpar beginning in early 2013.  Mr. Boysen, for his part, maintains that ITW had unreasonable expectations for his performance, that his negative evaluations were pretextual and part of a retaliatory effort to terminate him, and that ITWCC outperformed other divisions in the electronics group.

## C

The parties' pre-suit correspondence is central to our analysis, so we recount it in some detail.

In its termination letter dated March 17, 2014, ITW stated that Mr. Boysen was being terminated for overall poor performance.  A month later, Mr. Boysen's

counsel, Lawrence Ashe, sent a letter declining ITW's severance offer and contesting ITW's assertion that Mr. Boysen was terminated for poor performance. The letter offered detailed support for Mr. Boysen's satisfactory performance.

On May 27, 2014, ITW's counsel, John P. Scruggs, sent a response letter explaining that Mr. Boysen was not eligible for severance benefits under the Plan because (1) his termination was not due to a position elimination and (2) he was terminated for cause. The letter also offered support for ITW's claims of poor performance and instructed Mr. Boysen to make a claim to the plan administrator if he disagreed with the decision. The letter explained the following as to Mr. Boysen's former position:

> General Manager of Chemtronics/Techspray/Prolex[ ] was, and continues to be, critical to the overall success of the ITW Contamination Control Electronics Group. Upon Mr. Boysen's termination, the Company immediately commenced a search for a successor. As of this writing, candidates have been interviewed and are being vetted. Although no offer has yet been made, the job held by Mr. Boysen has most definitely not been eliminated and *will* be filled in the immediate future.

ITW 00049 (emphasis in original). Mr. Ashe replied, again contesting ITW's assessment of Mr. Boysen's performance.

In June of 2014, Mr. Goldman, the plan administrator, responded to an earlier letter from Mr. Ashe regarding severance benefits. Mr. Goldman explained that he was denying the claim because, "the basic fact is that you were terminated for

reasons other than the elimination of your job.  That being the case, you are not entitled to Separation Benefits . . . ."  ITW 00084 ("Initial Decision").  The letter did not mention "for cause" termination or Mr. Boysen's job performance, though it did reserve the Plan's right to "review, assess[,] and/or rely upon, any other eligibility prerequisites should it later be determined to be proper to do so."  *Id.*

Correspondence between Mr. Ashe and Mr. Scruggs continued over the summer of 2014, and Mr. Ashe replied to Mr. Scruggs' May 2014 letter on July 25, 2014.  Mr. Ashe reiterated his contention that Mr. Boysen's performance was superior, and requested documents related to hiring for Mr. Boysen's previous position.  Specifically, Mr. Ashe asked for job postings, a copy of the offer letter, and payroll information for any new hire.  He requested details about the position, including "title, classification, compensation, product brands, geographic territory, and other relevant information . . . includ[ing], for example, whether the successor's position—if he or she was already an ITW employee—was eliminated, and the person's age and length of service."  ITW 00102 & n.2.  He also stated that he had learned there was no longer a General Manager I position at ITW.

In response to this letter, Mr. Scruggs explained in an August 5, 2014, email that the General Manager job was not eliminated.  "To the contrary," he wrote, the position had already been filled.  *See* ITW 00104.  In support, he attached an internal memorandum from July 22, 2014, with the following announcement:

> Ken Caskey, who most recently led the sales team for the
> Chemtronics/Techspray/Plato brands, has assumed the
> position of Business Unit Manager for the CC Electronics
> Group. In his new role, Ken reports directly to me and is
> responsible for the group's full p&l and global growth.
> Ken's intense focus on delivering value to customers and
> inspiring a winning team are important assets in his new
> role.

ITW 00106. To explain the change in title, Mr. Scruggs offered the following:

> While the title of 'General Manager' was changed across
> all ITW businesses to 'Business Unit Manager,' the *duties*
> . . . did not change. The newly appointed 'Business Unit
> Manager' has the same responsibility for the full P&L for
> the same businesses . . . . His position was neither
> eliminated, nor did its scope of responsibilities change.

ITW 00104 (emphasis in original). Mr. Scruggs clarified: "For this reason alone,

Mr. Boysen is not entitled to Separation Pay Plan benefits, notwithstanding your

contention that he was discharged without good cause." *Id.* He denied Mr. Ashe's

July 25th information requests without explanation.

On August 8, 2014, Mr. Ashe wrote to Mr. Scruggs contesting ITW's refusal

to provide more information because he could not assess ITW's position or offer

without the requested information. *See* ITW 00107. He raised the title change and

asked for additional related documentation. Mr. Ashe noted that it should be

"relatively easy" for ITW to produce "a restructuring document or communication

regarding this systemic, company-wide change." *Id.* He also requested the job

descriptions for the General Manager and Business Unit Manager positions to be

able to compare them and renewed his requests for the offer letter provided to Mr. Boysen's replacement, as well as basic payroll information for both positions, including grade level, classification, eligibility for stock, and compensation range. Mr. Ashe explained that Mr. Boysen would be forced to litigate to obtain the documents in discovery if ITW again refused to provide them.

On August 11, 2014, Mr. Ashe formally appealed the plan administrator's decision. *See* ITW 00109. He again emphasized his evidence in support of Mr. Boysen's purported satisfactory job performance. Mr. Ashe pointed to the company-wide title change as evidence of a position elimination and asked for additional related information. He requested (1) documentation discussing the company-wide title change; (2) the identities of all current general managers at ITW; (3) job descriptions for both general managers and business unit managers; (4) updated financial information for Mr. Boysen's business unit and the electronics division; and (5) the offer letter provided to Mr. Boysen's replacement, along with basic payroll information for both positions, to include grade level, classification, responsibilities, stock eligibility, and compensation range. *See id.* He noted that Mr. Caskey (the new Business Unit Manager) had previously worked as a Business Unit Manager and had reported to Mr. Boysen, his General Manager, in that position. *See id.*

On September 10, 2014, Mr. Goldman responded, clarifying the basis for his initial decision and responding to the document requests.  In unambiguous terms, Mr. Goldman stated:

> [J]ob elimination is a prerequisite to benefits under the Plan and other issues or disputes are irrelevant to Plan benefit entitlement absent a job elimination.  **That Mr. Boysen was found to have not lost his job due to a "job elimination" was and is the sole basis for the prior denial of benefits.**  No other issues are relevant or relied upon by the Plan and only data relevant to whether his job was eliminated is relevant to the appeal under the relevant ERISA standard.

ITW 00115 (emphasis in original).  Turning to the information requests, Mr. Goldman explained that "company-wide title issues . . . are not relevant to the question of job elimination under the Plan."  He similarly deemed the identities of general managers irrelevant to whether Mr. Boysen lost his job due to job elimination.  As for the request for General Manager I and Business Unit Manager descriptions, he explained that there was no unified description and concluded that, in any event, it was irrelevant.  He did not produce a description for Mr. Boysen's prior position because one did not exist, but he attached a copy of the applicable job description for the ITWCC business manager.  He denied Mr. Boysen's request for updated financial information as irrelevant.

Mr. Goldman attached a copy of Mr. Caskey's offer letter, though he redacted the financial information "as it has no bearing on whether Mr. Boysen's job was

eliminated."  Noting that the letter "refers to Chemtronics" alone, he explained that

"Mr. Caskey also assumed the managerial responsibilities upon hire for Prolex . . .

and TechSpray . . . .  It is my understanding that Mr. Boysen's managerial scope . . .

was the same as that of Mr. Caskey[.]"  Mr. Goldman also denied the request for

comparative payroll information as irrelevant.  Mr. Boysen did not provide any

additional documents or materials in support of his position to Mr. Goldman, despite

Mr. Goldman's offering an additional 60 days for him to do so.

On December 3, 2014, Mr. Goldman issued his final decision upholding the

initial determination.  According to Mr. Goldman, the Plan found that "Mr. Boysen's

job was not permanently eliminated but rather he was replaced by Mr. Caskey and

. . . the change in title of the position does not equate to a permanent job elimination

under the plan."  ITW 00152.

**D**

On May 27, 2015, Mr. Boysen filed suit in federal court.  From the outset, the

parties disagreed over the appropriate scope of discovery.  ITW and the Plan were

unwilling to voluntarily produce anything outside of the existing administrative

record but Mr. Boysen identified a number of potential areas for discovery in the

joint discovery plan.  *See* D.E. 10.  Mr. Boysen sought copies of his own personnel

file and most recent job description; information about the scope of responsibilities

and compensation of general managers and business unit managers; Mr. Caskey's

personnel file and all job descriptions applicable to his employment at ITW; communications related to Mr. Boysen's job performance and termination; documents and communications related to ITW's restructuring; and documents and communications related to the selection of his replacement.  In a summary order entered November 18, 2015, the district court ordered that discovery would "be as requested by [Mr. Boysen] in the Joint Preliminary Report and Discovery Plan" and gave the parties four months to complete discovery.  D.E. 11.

According to Mr. Boysen's March 3, 2016, motion to compel, in response to his first formal discovery request ITW and the Plan had produced only the administrative record; Mr. Boysen's personnel file; selected portions of Mr. Caskey's personnel file; and 14 emails collected by Mr. Boysen's former supervisor and a human resources representative.  *See* D.E. 19 at 1–2, 6.  Mr. Boysen laid out the reasons he required documents pertaining to his performance, as well as more detailed personnel records.

In their response, ITW and the Plan argued, among other things, that communications regarding Mr. Boysen's performance going back six years were irrelevant because "**Plaintiff's job performance is irrelevant to this case.**  This case concerns **only** whether Plaintiff's position was eliminated, as that is the **only** way Plaintiff can qualify for severance benefits[.]"  D.E. 21 at 18–19 (emphasis in original).  The district court granted in part Mr. Boysen's motion to compel:

> To the extent not already produced, Defendants are
> ordered to promptly produce all records concerning the
> documented reasons for Plaintiff's termination of
> employment from Illinois Tool Works Inc. Additionally,
> Defendants shall make the Plan Administrator, Elliot
> Goldman, available for deposition. Plaintiff's Motion to
> Compel Discovery is otherwise denied.

D.E. 26 at 1–2.

ITW and the Plan thereafter conducted limited searches of their electronically

stored information and produced a few hundred pages of documents. Among the

documents produced were speaker notes from an undated presentation about

"Business Structure Simplification." *See* ITW 00596. That document stated, in

relevant part, as follows:

> As we move towards creating Divisions ($100mm+) with
> VP/GMs leading these divisions*, the need for a General
> Manager is being eliminated*. Rather, Business Units will
> become apart [sic] of these larger Divisions
> (consolidated), led by Business Unit Managers.
>
> *[T]he General Manager level and title is being phased out*
> and current incumbents are being mapped to the new ITW
> Operating Structure . . . . In some cases, where the
> business LRP intends to get to $100m, the incumbent GM
> has been 'grandfathered' in grade and title. However, in
> most cases, current business GM's [sic] have been mapped
> to a Business Unit Manager. This means that existing
> GMs at a grade 15 have been realigned to a BUM grade
> 14 or 13 depending on revenue size, scope and complexity
> of business. It's expected that in the future, these stand
> alone [sic] businesses will consolidate administration and
> streamline functions (Finance, HR, Marketing, Sales,
> Operations) into the larger division ($100m) therefore not

> having the scope and complexity as in the past as a stand
> alone [sic] $30m business.

*Id.* (emphasis added).  The notes went on to explain that this restructuring meant that incumbent general managers were being realigned "to a lower job grade" which would "have a negative impact on their position in salary range."  And it meant that current general manager incumbents, who had been "realigned" to business unit managers, would no longer be eligible for the company's long-term incentive program.

At his deposition, Mr. Goldman explained that he had not looked "to see if [job grade and salary] were the same or different.  [He] looked to see if the job was the same, and it was."  Elliot Goldman Deposition Transcript, D.E. 52 at 96.  He conceded, however, that he had not reviewed the BSS presentation, and that there were several things in the presentation that didn't "coincide" with his "understanding of things" when it came to the General Manager position. *See id.* at 125–26.  After Mr. Goldman's deposition, Mr. Boysen filed a second motion to compel limited discovery prior to a ruling on summary judgment.  The district court denied that motion.

The district court also denied Mr. Boysen's later emergency Rule 56(d) motion and granted summary judgment for ITW and the Plan.  In its order granting summary judgment, the district court explained: "Because the issue of job elimination was the only one which the Administrator considered, the Administrator

14

only needed to investigate arguments that were reasonably connected to that issue. Whether [Mr.] Boysen was fired for cause is irrelevant." D.E. 67 at 17.  According to the district court, "[t]he documentary record is absolutely clear that [he] was fired for poor performance.  There is no evidence that this was a pretext for eliminating his position." *Id.* at 18.

## II

We review the district court's grant of summary judgment in an ERISA case de novo, applying the same standard the district court used in its review.  *See Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 672 (11th Cir. 2014).  "While ERISA and the . . . regulations provide certain minimum procedural requirements, the statute and regulations do not provide a judicial standard of review for courts reviewing administrators' benefit-eligibility decisions."  *Id.*

The Eleventh Circuit has established a six-part test for review of eligibility determinations, s*ee Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011), but none of the relevant authorities expressly provides a governing standard of review for determining whether a plan administrator has satisfied the necessary "minimum procedural requirements" or provided a full and fair review. At oral argument, counsel for ITW and the Plan stated that the appropriate standard on this issue was de novo.  We agree.

Generally, when a plan gives a plan administrator discretionary authority to make benefits determinations—as this one undisputedly does—benefits denials are reviewed under an arbitrary and capricious standard. *See id.* Here, however, the initial question is not whether the plan administrator erred in interpreting or applying the Plan. We are instead reviewing whether the plan administrator adequately complied with the procedural aspects of the applicable statutes and regulations, and "[t]he interpretation of ERISA, a federal statute, is a question of law subject to de novo review." *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 581 (2d Cir. 2006) (citation omitted). *Cf. Draper v. Atl. Indep. Sch. Sys.*, 518 F.3d 1275, 1284 (11th Cir. 2008) ("To the extent that this issue involves the interpretation of a federal statute, it is a question of law which we review *de novo*") (emphasis in original and citation omitted). Because such adherence to statutes and regulations involves no discretionary call by the plan administrator, "we owe the plan administrator[ ] no deference." *Wilkins*, 445 F.3d at 581. *See also Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1199–1200 (11th Cir. 2010) (concluding, at step one of the *Williams* test, that the plan administrator's failure to adequately address claimant's arguments or properly investigate claim was de novo wrong).

Further, we are persuaded by our reading of *Melech*. We did not, in that case, expressly state which standard should apply to review a plan administrator's review and compilation of the record. But we are nevertheless confident that the panel

applied a de novo standard.  The *Melech* panel explained that this question fell outside the six-part test generally applied to ERISA benefits decisions, "as it is a predicate to our ability to review the substantive decision we have been asked to review."  *Melech*, 739 F.3d at 673.  Here, as in *Melech*, we are not deciding whether the plan administrator's decision enjoys factual support in the record; rather, we are reviewing whether the plan administrator satisfied his obligations in compiling that record.  We cannot see, and no party has explained, why such an inquiry requires deference to the administrator.[1]

Under ERISA, a plan administrator is considered a fiduciary tasked with "discharg[ing] his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of[ ] providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses" of plan administration.  29 U.S.C. § 1104(a)(1)(A).  He must use the "skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in

---

[1] We are mindful that other circuits have taken different approaches to the issue.  *See, e.g., Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 694 F.3d 557, 567 (5th Cir. 2012) ("Absent potential wholesale or flagrant violations that evidence an 'utter disregard of the underlying purpose of the plan,' this court does not heighten the standard of review from abuse of discretion to de novo."); *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 20 (4th Cir. 2014) (concluding plan administrator abused its discretion when it "chose to remain willfully blind to readily available information that may well have confirmed [claimant's] theory of disability"); *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 801, 807 (10th Cir. 2004) (concluding that denial of benefits was arbitrary and capricious because plan administrator failed to conduct a reasonable investigation into the claim).  Here, we follow *Melech*'s well-reasoned approach.

the conduct of an enterprise of a like character and with like aims." *Id.* at §
1104(a)(1)(B).   This standard of care places upon a plan administrator "the
responsibility to fully investigate [a] . . . claim[ ] before denying benefits." *Capone*,
592 F.3d at 1199–1200.

## III

We have previously held that "[a]s a matter of common sense, we cannot
evaluate [a plan administrator's] ultimate decision to deny [a] claim without first
considering whether the record [the administrator] had before it was complete."
*Melech*, 739 F.3d at 673 (citation omitted).   As discussed above, we acknowledged
that the first step of the *Williams* test involves de novo review, and explained that
the full and fair review inquiry is antecedent to the *Williams* test.   *See id.*   We
conclude the plan administrator here did not compile or review a complete record.

## A

Mr. Boysen argues that the plan administrator denied him a full and fair
review in a number of ways.   First, he asserts that the plan administrator failed to
interview critical witnesses, including himself and Mr. Caskey, and failed to compile
numerous documents and evidence relating to ITW's restructuring, system-wide title
changes, or Mr. Caskey's personnel file.   Second, he claims that the plan
administrator improperly failed to consider documents and evidence that Mr. Boysen

submitted "by identification."  Third, he asserts that the plan administrator failed to provide him with all documents relevant to his claim.

Underlying each of Mr. Boysen's arguments is that the plan administrator pointed exclusively to Section 2.1(a) of the Plan—the threshold requirement that termination be based on job elimination—to deny Mr. Boysen's separation benefits claim.  But to find that Mr. Boysen was not terminated due to elimination, the plan administrator relied almost entirely on evidence showing that Mr. Boysen was terminated for poor performance.  This, Mr. Boysen argues, looks very much like a denial under Section 2.1(b) due to "for-cause" termination.

According to Mr. Boysen, the Plan and ITW are not free to now rely on Section 2.1(b) for the purposes of litigation when the sole reason offered during administrative review was Section 2.1(a) (non-elimination).  This, says Mr. Boysen, constitutes an improper shift in the reason for the denial of his claim during litigation, which violates both the Plan's terms and applicable ERISA regulations.

The Plan and ITW respond by arguing that Mr. Boysen is precluded from contesting the plan administrator's review because he did not produce any documents, even though it was his burden to prove his entitlement to benefits.  Moreover, they say, the plan administrator was not obligated to ferret out evidence to prove or disprove every one of Mr. Boysen's theories.  The Plan and ITW also argue that there is no evidence any restructuring information or materials exist, and

that the record was complete.  In support of their latter contention, they highlight the extensive evidence in the record indicating that Mr. Boysen was terminated for poor performance and that he failed to challenge the content of any documents related to Mr. Caskey.  They also make much of the relatively small volume of documents their supposedly extensive ESI searches yielded.

In response to Mr. Boysen's argument that they have improperly changed the basis for the denial of benefits, ITW and the Plan assert that Mr. Boysen "misstates the nature of the review conducted at the administrative level."  Appellees' Br. at 45.  They contend that "Mr. Goldman was called upon to determine whether the precipitating cause of Mr. Boysen's termination was a permanent job elimination [and] Mr. Goldman discharged this obligation by reviewing . . . evidence . . . which . . . confirmed that [Mr.] Boysen was terminated for poor performance[,]" and not job elimination.  *Id.*

## B

As an initial matter, we are generally in agreement with ITW and the Plan that they have not shifted their position on their reason for denying Mr. Boysen's claim. A finding that Mr. Boysen was terminated for any reason other than a job elimination may theoretically provide a basis to conclude that he was not terminated because his position was eliminated.  ITW and the Plan are essentially arguing that, if Mr. Boysen was terminated for any of reasons A through Y, then he necessarily was not

fired for reason Z.  In theory, the effect of a finding of poor performance at the Section 2.1(a) threshold stage or the Section 2.1(b) disqualification stage is much the same: it results in a denial of the claim.  Nevertheless, the plan administrator's use of Section 2.1(a) alone has practical effects on the review process.

The difference is perhaps best understood in considering not what the plan administrator did, but what avenues were open to Mr. Boysen to challenge the plan administrator's actions and ultimate decision.  To have any hope of successfully challenging the initial benefits decision on appeal, Mr. Boysen would have had to argue and show either (1) that he was not terminated for poor performance or (2) that his job was eliminated.[2]

A finding that Mr. Boysen was not fired for poor performance would have obligated the plan administrator to restart his investigation into the reason for Mr. Boysen's termination (and, frankly, into whether "poor performance" was a pretext).  Success on the job elimination argument likely would have resulted in victory for Mr. Boysen as, having already disclaimed Section 2.1(b), *see* Appellees' Br. at 47, the plan administrator may have had to end his analysis with a finding of job elimination.  At that point, even if the evidence of poor performance were overwhelming, the Plan Administrator would not have been free to raise for-cause

---

[2] As the plan administrator asserts:  "[O]nly data relevant to whether his job was eliminated is relevant to the appeal under the relevant ERISA standard."  ITW 00115.

termination and would have had to stick with the threshold question which he exclusively analyzed.

Against this backdrop, we conclude that the plan administrator was not free to refuse to investigate the restructuring that—as we now know—some ITW employees had already conceded occurred, and to simultaneously refuse to consider Mr. Boysen's evidence of satisfactory performance.  Cutting off even one avenue to challenge the determination would have been problematic, but the process here effectively made it impossible for Mr. Boysen to oppose the decision.[3]

## C

We assume, for the sake of argument, that ITW and the Plan are correct that the burden is generally on a claimant like Mr. Boysen to prove his entitlement. *Compare Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir.

---

[3] There is some dispute about whether the plan administrator actually considered Mr. Boysen's proffered arguments and evidence related to performance.  Neither of his decisions contains discussion or rebuttal of Mr. Ashe's points.  At his deposition, Mr. Goldman testified that he did not investigate Mr. Boysen's assertions that he outperformed others in the electronics division, explaining: "It wasn't relevant.  The relevant issue for me was as follows: Was there job elimination, and then related to that, I did undertake . . . an investigation of that issue because that's the issue . . . .  I did, however, [in light of the allegations of ulterior motives] investigate his performance by speaking to Mr. Hammouri, . . . Ms. Goldstein, . . . [and] Ms. Lewis," and by requesting documents and communications about Mr. Boysen's performance, "and absolutely nothing in there suggested that there was any other rationale for [his termination]."  Goldman Dep. Tr. 42:1–43:18.  ITW and the Plan argued at summary judgment that this was enough to show that the plan administrator "undertook substantial effort to explore Plaintiff's vaguely articulated theories that his termination was not proper."  D.E. 63 at 2.  We cannot tell from the record before us whether or how the plan administrator investigated Mr. Boysen's argument and evidence, and we do not think the deposition testimony establishes that he actually took Mr. Boysen's points into consideration.  *Cf. Capone*, 592 F.3d at 1199.

1998) ("A plaintiff suing under [29 U.S.C. § 1132(a)(1)(B)] bears the burden of proving his entitlement to contractual benefits."), *with Melech*, 739 F.3d at 673 (looking to a plan's terms to determine who has the burden). And we acknowledge that nothing in ERISA statutes or our precedent requires a plan administrator to "ferret out evidence in [Mr. Boysen's] . . . possession." *Id.* But this does not mean that the plan administrator is free to simply ignore evidence that has a direct bearing on, or refutes, his findings. Nor can he refuse to conduct additional investigation when it has been brought to his attention that relevant documents almost certainly exist. Prior precedent supports our conclusion.

Our decision in *Capone*, 592 F.3d at 1189, is instructive here. *Capone* involved a claimant seeking disability benefits after he was injured diving into shallow water. In denying benefits, the plan administrator had failed to "investigate the depth of the water at low . . . [or] high tide and the tidal conditions at the time of the accident." *Id.* at 1199. It had also "made no attempt to locate other guests who might have been on the scene." *Id.* And the record did "not reflect any additional action taken" by the plan administrator to review its decision after the claimant had shown certain of the administrator's assumptions were erroneous. *Id.* at 1199. As a result, we held that the administrator had not satisfied its obligation to fully investigate the claim, as it had "failed to adequately address the issues raised in

[claimant's] appeal and the denial of benefits without a proper investigation" is de novo wrong. *Id.* at 1199–1200.

In *Melech*, we held that the administrator's refusal to consider the Social Security Administration's decision granting disability benefits, along with the evidence generated in that administrative process, constituted procedural unfairness which warranted a remand. Central to our decision was the fact that the plan obligated claimants seeking disability benefits to simultaneously apply for social security benefits, and actively participate in the SSA's decisional process. We concluded that the administrator's treatment of the claimant's SSA application was "inconsistent with the fundamental requirement that an administrator's decision to deny benefits must be based on a complete administrative record that is the product of a fair claim-evaluation process." 739 F.3d at 676. We remanded to the plan administrator to evaluate the claim using the evidence produced in the SSA process. *See id.*

In *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208 (11th Cir. 1997), the claimant's request for coverage of an organ transplant surgery was denied under an experimental or investigational medicine exclusion in the policy. Following a bench trial, the district court found that the plan administrator had failed to consider all relevant evidence available in denying benefits and remanded. On remand, the administrator concluded the operation would have been covered under current

standards but still denied benefits because, at the time the claim was first submitted, the record indicated the procedure was experimental. The district court entered final judgment for the claimant in accordance with the administrator's conclusion that the procedure was now covered.

At the time of the original determination in *Shannon*, the plan administrator had relied entirely on a conclusory recommendation of denial from the plan's medical consultant; statements from insurance companies that the subject transplant was experimental; and Medicare's denial of coverage. We said that "[s]imply accepting the bald assertions of [the plan's medical consultant] and the denial of other insurance companies without examining or evaluating their underlying bases and failing to obtain additional relevant information was arbitrary and capricious." *Id.* at 211. We held that the district court's remand for additional inquiry was therefore not error, given the administrator's failure to make a reasonably relevant inquiry. "Nor can we say that the district court erred in directing the . . . administrator to consider subsequently available evidence." *Id.* Because the duty to provide benefits is continuing, so too is a denial—"the propriety of which is measured against the information available from time to time." *Id.* (internal quotation marks and citation omitted).

Here, the record indicates that the plan administrator repeatedly refused to consider highly relevant evidence, or evidence which contradicted (or potentially

conflicted with) his decision. For example, without suggesting that any one type or piece of evidence is determinative in severance benefits cases, we find it highly unusual that a plan administrator would deem compensation information, set forth in an offer letter to a claimant's purported replacement, irrelevant. Here, the position being offered in the letter bore a different title and was offered to someone who once reported to the Mr. Boysen in a similar "Business Unit Manager" capacity. The ongoing discussions of system-wide title changes and "restructuring," together with Mr. Boysen's direct request for related documentation, should have put the plan administrator on notice. He was required to do more than to accept the verbal representations of a few ITW employees about the details of Mr. Caskey's position, particularly without speaking to Mr. Caskey himself. [4]

We are mindful of ITW's and the Plan's argument that the speaker notes produced during discovery do not support Mr. Boysen's claim. Indeed, ITW and the Plan assert that the document "states the exact *opposite*—that GM incumbents would be *retained*" and either "grandfathered" or be "realigned to a Business Unit Manager." Appellees' Br. 34–35. ITW and the Plan may well be proven right after additional investigation and review. But without such investigation, we cannot agree that the document definitively supports any party's position.

---

[4] Suppose that Mr. Caskey's salary was merely half of Mr. Boysen's previous salary. Couldn't one reasonably conclude that such a large reduction in pay constituted a position elimination when coupled with the other circumstances?

The Plan and ITW also argue that Mr. Boysen bore the burden to produce evidence in support of his arguments.  But that argument is misplaced.  This is not a typical benefits case in which the claimant has the necessary medical or personal records in his possession and simply fails to provide them.  Here the plan administrator was in a much better position to identify and review internal information about any restructuring at ITW.  It is antithetical to the plan administrator's fiduciary duty to refuse to seek documents that would be in the exclusive control of the company and then blame Mr. Boysen for not producing sufficient evidence.

The refusal to make a reasonable inquiry into the purported restructuring, standing alone, might be sufficient to warrant our remanding for further review and analysis.  But that refusal was compounded by the plan administrator's apparent rejection of Mr. Boysen's performance-related evidence and arguments and unwillingness to dig deeper into that topic.  Having made clear that a finding of poor performance rendered a thorough investigation into job elimination unnecessary, the plan administrator was not free to then decline to consider evidence challenging his performance findings.  The plan administrator could do an end-run around claims procedures by relying on alleged poor performance to prove non-elimination of Mr. Boysen's job and then use those findings to deny his information requests and discourage the submission of evidence.

Nothing in ERISA, of course, requires plan administrators to independently "scour the countryside in search of evidence to bolster a petitioner's case." *Harrison*, 773 F.3d at 22.  But, as the Fourth Circuit explained in *Harrison*, neither does "ERISA . . . envision that the claims process will mirror an adversarial proceeding where the claimant bears almost all of the responsibility for compiling the record, and [where] the fiduciary bears little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim." *Id.* at 21 (internal quotation marks omitted) (quoting *Gaither*, 394 F.3d at 807).  "Rather, the law anticipates, where necessary, some back and forth between administrator and beneficiary." *Id.*  "A searching process does not permit a plan administrator to shut his eyes to the most evident and accessible sources of information" that might support the claim; indeed, "an ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter." *Id.* (internal quotation marks omitted) (quoting *Gaither*, 394 F.3d at 808).

We do not hold that plan administrators are obliged to search for and consider every document "submitted by identification."   We rule only that plan administrators, constrained as they are by certain fiduciary obligations, cannot refuse to consider key relevant information, or to investigate further when faced with potentially conflicting evidence, or deny access to information that is potentially beneficial to a claimant.

**IV**

For the foregoing reasons, we vacate the district court's judgment and remand for further review of Mr. Boysen's benefits claim.  Before addressing Mr. Boysen's ERISA claim on the merits, and before deciding whether a remand to the plan administrator is warranted, the district court should ensure that the plan administrator has provided Mr. Boysen with all the discovery previously ordered.

**VACATED AND REMANDED WITH INSTRUCTIONS.**

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 03, 2019

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  17-13145-FF
Case Style:  David Boysen v. Illinois Tool Works Inc., et al
District Court Docket No:  1:15-cv-01900-TWT

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellees.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Janet K. Mohler, FF at (404) 335-6178.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs